Filed 12/20/23  P. v. Delagarza CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RAUL DELAGARZA,<br><br>    Defendant and Appellant. | G061478<br><br>Super. Ct. No. 17CF1892<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lance P. Jensen, Judge.  Affirmed with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Charles C. Ragland, Assistant Attorneys General, Eric A. Swenson and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

After a jury found Raul Delagarza guilty of voluntary manslaughter and possession of a firearm by a felon, he was sentenced to 25 years to life, plus 15 years, four months in prison. On appeal, he contends the trial court prejudicially erred: (1) in overruling his objection to the prosecutor's exercise of a peremptory challenge; and (2) in admitting evidence of his prior acts of violence. We conclude there was no substantial likelihood the peremptory challenge was based on an invalid ground such as race. We further conclude the court did not abuse its discretion in admitting evidence of Delagarza's past violent acts. Finally, we exercise our discretion to order the clerk of the superior court to correct the abstract of the judgment to conform to the oral pronouncement of sentence. Accordingly, we affirm the judgment with directions to correct the abstract of judgment.

## FACTS

On December 3, 2019, an information was filed charging Delagarza with the murder of S.F. (Pen. Code, § 187, subd. (a); count 1), and possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 2). As to count 1, it was further alleged that Delagarza intentionally and personally discharged a firearm proximately causing the death of S.F. It also was alleged that Delagarza previously suffered at least two serious and violent felony convictions (Pen. Code, §§ 667, subd. (d) & (e)(2)(A), 1170.12, subds. (b) & (c)(2)(A)).

At trial, S.S. testified that in July 2017, he resided in a treatment center with 15 other guys, including Delagarza and the victim S.F., who were roommates in an upstairs unit. On July 24, S.S. was sleeping on a couch on the ground floor when he woke up to the sound of gunshots. He heard the sound of a struggle and S.F. saying, "'Help, help.'" Delagarza then came downstairs. As he passed by S.S., Delagarza said, "'You are a lucky motherfucker. You're lucky.'" After Delagarza left, S.S. rushed upstairs. He saw S.F. on the ground, bleeding from a bullet hole in his back. S.F. was not breathing.

2

At the start of the defense case, counsel read a stipulation as to S.F.'s prior convictions. These included two second degree robberies and three assaults with a deadly weapon or with force likely to produce great bodily injury.

Delagarza testified in his own defense. He admitted that in the mid-1990s, he had convictions for grand theft and misdemeanor possession of a firearm. In 2005, he was convicted of rioting in a federal prison, and in 2006, he was convicted of aggravated assault with a knife. In 2011, he was convicted of grand theft auto and evading arrest. In July 2017, Delagarza called his parole officer and requested that he be placed in a drug treatment center. About a week after he entered the treatment center, S.F. became his roommate. When Delagarza first saw S.F., who was a large man, he recalled how a "Pacific Islander" had beaten his friend Stomper. During their first interaction, S.F. told Delagarza he would be using some of Delagarza's clothes. Two weeks later, S.F. informed Delagarza he would be paying $600 a month for "'rent.'" Delagarza gave a noncommittal response.

Shortly after, Delagarza felt that S.F. was trying to intimidate him. On several occasions, when Delagarza was working out in the weight room, S.F. would come and begin lifting "pretty impressive," heavy weights while making countdown-related noises which pressured Delagarza and made him feel like he was "on the clock." Delagarza did not complain about S.F. to the center's management because he did not want to be a "snitch." He could not pay S.F. because he did not have a job. Delagarza became scared and obtained a handgun to protect himself.

Early morning on July 24, 2017, Delagarza woke up to find S.F. sleeping in their room. Delagarza was surprised because S.F. normally slept downstairs after playing video games and watching movies. Delagarza began preparing to leave to look for a job when S.F. got up and began making additional countdown sounds. Delagarza laughed and said, "I am not going [to] deal with this shit right now; it is too early in the morning." S.F. responded by saying, "You better have my fucking shit," and "rushed" at

3

Delagarza." S.F. hit Delagarza on the right side of his head and pushed him into the back of the bed. Delagarza retaliated by firing his gun "blindly as fast as he could" after remembering how his friend Stomper had been beaten up. Delagarza then ran out of the room. He left the center and took a bus to his aunt's house, where he was arrested.

During cross-examination, Delagarza stated he had committed violent acts in the past. Presently, he was not a "peaceful person, but I don't conduct myself as a violent person." Asked whether he had been in "jail since 2017," Delagarza responded, "Yes, I have had a few fights." Thereafter, over defense objections, the prosecutor inquired about Delagarza's fighting incidents. Delagarza admitted that besides "fair" "one-on-one fights" while in jail, he also participated in a group attack on an inmate in December 2017 and on a deputy in 2018. He also admitted that in his assault case, he stabbed the victim in chest, puncturing his lung. In his evading arrest case, he drove 100 miles an hour "through an elementary school."

On March 24, 2022, a jury found Delagarza not guilty of murder, but found him guilty of the lesser included offense of voluntary manslaughter. The jury found true the personal firearm use allegation. It also found Delagarza guilty of possession of a firearm by a felon. In a bifurcated proceeding, the court found true the prior conviction allegations.

The trial court sentenced Delagarza to an indeterminate term of 25 years to life, plus a consecutive term of 15 years four months. This sentence included two five-years terms for the prior conviction allegations under Penal Code section 667, subdivision (a)(1).

## DISCUSSION

I. *Peremptory Challenge*

Delagarza first contends the trial court erred in permitting the prosecutor to exercise a peremptory challenge to Juror 112 (Juror (112).

4

A.  *Relevant Facts*

During voir dire, Juror 112 stated he worked in artist relations and stage management for festival and nightlife events.  He witnessed fights at some events, and had to provide statements to law enforcement on several occasions.  In response to the court's questioning on whether he could be fair and impartial, Juror 112 stated that he "want[s] to believe [he] could," but he had a "general distrust of police."

During questioning by defense counsel on whether he would be able to find defendant not guilty if the prosecutor did not prove all of the elements of an offense, Juror 112 reframed the question as "What was my first thoughts when I heard the case was about?" and answered, "It was like pictures and stuff."   He then stated:

"Well, listening to you talk to everybody else, it seems like you — bring up something about like defending yourself and whatnot.  I think the judge did say when there was like — we would see a photo of a gunshot wound in the back or something like that.  If it is like, I was thinking, like, if you are defending yourself like and you use deadly force and you shoot someone in the back, like, was that person, like, running away, possibly coming back with even more [deadlier] force?  Something like that.  And then it reminded me of something that did happen to my uncle.

[¶] . . . [¶]

"Early [in the] '90s he got kidnapped and somehow fought against the kidnappers and used deadly force, but the kidnapper was running away.  He was like a terrorist in the Philippines, something like that."

Defense counsel then referenced Juror 112's prior statement that he distrusted police and asked whether he could be fair if the only testifying percipient witnesses were civilians.  Juror 112 responded, "Assuming they are truthful as well, yeah."  Counsel noted that whether a witness is truthful is a separate issue and restated his question on whether Juror 112 would be fair to civilian witnesses.  Juror 112 eventually stated, "I think so?"

5

During questioning by the prosecutor on evaluating witnesses, Juror 112 stated he understood a witness who took an oath to tell the truth could still lie. The prosecutor also inquired about Juror 112's distrust of police. He stated that his distrust stemmed from his "personal interactions with the police." He explained he had more negative than positive interactions with police. He also stated he was not sure whether he would believe a civilian witness more than a police officer. He believed he would be able to set aside his distrust of police, even if the officer was a "jerk," and be able to vote guilty if the other evidence convinced him beyond a reasonable doubt. When the prosecutor noted he "kind of hesitated" before answering, Juror 112 explained it was "kind of a long question." When the prosecutor restated the question, he stated: "I would go with what the facts and evidence tells me."

After the parties' for cause challenges, the prosecutor exercised the first and his only peremptory challenge for the day. The defense exercised nine peremptory challenges, and the prosecutor accepted the panel, which included Juror 112, repeatedly.

The following day, after the new prospective jurors were questioned, the prosecutor exercised a peremptory challenge to Juror 112 and the defense objected. As was the case each time a party objected to a peremptory challenge, the court asked about the reasons for challenge and the perceived cognizable group the juror belongs to. The prosecutor stated: "I believe he is an Asian male . . . ." He then provided his reasoning:

"He indicated his uncle had been kidnapped at some point in the Philippines and that his uncle had shot the people that kidnapped him as they ran away.

[¶]

"That was the issue for me. He had a similar situation close to him where he was – he had personal experience with something that he can bring in here with his uncle, kidnapping his uncle, wrestling some weapon away from his kidnappers and shooting them in the back as they were trying to run away.

6

"He was also hesitant. He used words like, 'I will try to be impartial' and 'I believe I can,' and that's kind of how he would be as a juror."

After the court noted that Juror 112 also indicated he had a mistrust of police, the prosecutor stated: "I want to be clear . . . I'm not basing [the peremptory challenge] on his general mistrust of law enforcement." After initially sustaining the defense objection, the court reconsidered and overruled the objection. It stated: "The court finds the reasons given for the exercise of the peremptory challenge by the People are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on the juror's ability to be fair and impartial in the case. The court is utilizing a clear and convincing standard to make such a finding."

B. *Analysis*

Code of Civil Procedure section 231.7 (Section 231.7) prohibits the use of "a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." It created "new procedures for identifying unlawful discrimination in the use of peremptory challenges. [¶] Under section 231.7, the party objecting to the peremptory challenge is no longer required to make a prima facie showing of racial discrimination. Instead, 'upon objection to the exercise of a peremptory challenge pursuant to [section 231.7],' the party exercising the peremptory challenge must state the reasons for exercising the challenge. (§ 231.7, subd. (c).) Also, certain reasons for a peremptory challenge are presumptively invalid under section 231.7 unless rebutted by clear and convincing evidence that they are unrelated to the prospective juror's perceived membership in a protected group and that the reasons bear on the juror's ability to be fair and impartial. (§ 231.7, subd. (e).) Those presumptively invalid reasons include the prospective juror having a negative experience with law enforcement . . . ." (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943, fn. omitted.)

7

Under section 231.7, subdivision (d), reasons that are not presumptively invalid are evaluated under a substantial likelihood standard from the perspective of an objectively reasonable person. (§ 231.7, subd. (d)(1).) The court is to determine from the totality of circumstances whether "there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge . . . ." (*Ibid.*) If so, the objection must be sustained. (*Ibid.*) The phrase "'substantial likelihood' means more than a mere possibility but less than a standard of more likely than not." (*Id.*, subd. (d)(2)(B).) "[A]n objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (*Id.*, subd. (d)(2)(A).) The term unconscious bias includes implicit and institutional biases. (*Id.*, subd. (d)(2)(C).)

On appeal, the overruling of an objection under section 231.7 is reviewed de novo "with the trial court's express factual findings reviewed for substantial evidence." (§ 231.7, subd. (j).) "The appellate court shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record." (*Ibid.*) The appellate court is to consider only those reasons actually given by the trial court and shall "not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court." (*Ibid.*) If the appellate court concludes the trial court erred by overruling an objection, "that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (*Ibid.*)

Here, the prosecutor's stated reasons for challenging Juror 112 were: (1) he had "personal experience" of a "similar situation" to the present crime because his uncle

was kidnapped and shot one of the kidnappers in the back; and (2) he was "hesitant" about whether he could be a fair and impartial juror. As an initial matter, neither reason is presumptively invalid under section 231.7. As to the "similar experience" reason, the record shows the victim was shot in the back and Delagarza was claiming self-defense. These facts are similar to Juror 112's uncle shooting a kidnapper in the back. Delagarza argues there was insufficient evidence to support the prosecutor's conclusion that the kidnapper was shot in the back because Juror 112 only stated his uncle used "deadly force" when "the kidnapper was running away." However, Juror 112 gave this answer immediately after stating that he was "thinking, like, if you are defending yourself like and you use deadly force and you shoot someone in the back." Thus, it is a reasonable inference that his uncle shot the kidnapper in the back. There is nothing in the record that this inference is based on "the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." (§ 231.7, subd. (a).)

As to Juror 112's hesitancy, the record shows his answers to whether he could be fair and impartial were equivocal. When defense counsel asked whether he would be fair to civilian witnesses, he answered, "I think so?" When the prosecutor asked whether he could set aside his distrust of the police and evaluate the evidence fairly, he "kind of hesitated" before answering. Delagarza argues that Juror 112's hesitancy was based on his distrust of police, and that this distrust was the prosecutor's real reason for challenging Juror 112. We disagree. First, the prosecutor did not actually give distrust of police as a reason, and the record does not show that distrust of police was the actual reason. For example, as noted above, Juror 112 was equivocal about whether he could believe fair to civilian witnesses when he answered "I think so?" In sum, under the totality of the circumstances, there is not a substantial likelihood "that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of

those groups, as a factor in the use of the peremptory challenge." (§ 231.7, subd. (d)(1).) The trial court properly overruled the defense objection to the peremptory challenge to Juror 112.

## II. *Prior Violent Acts Evidence*

Next, Delagarza contends the trial court prejudicially erred in admitting evidence of his prior acts of violence under Evidence Code sections 1103 and 352.

Evidence Code section 1103 provides in relevant part that "evidence of the defendant's character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct)" (Evid. Code, §1103(b) is admissible if "offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character and is offered after evidence that the victim had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (1) of subdivision (a)." (*Ibid.*) Here, before the prosecutor elicited evidence of Delagarza's prior acts of violence, the defense had presented evidence of the victim's prior convictions for violent crimes and Delagarza had testified about the victim's extortion and threatening behavior. Thus, the prosecutor was permitted to offer evidence of Delagarza's prior acts of violence, which was relevant to his self-defense claim.

Delagarza argues the evidence was irrelevant because he admitted he had committed violent acts in the past and did not consider himself a "peaceful person." However, Delagarza also stated that he did not "conduct [him]self as a violent person." The prior violent acts evidence was relevant to rebutting this claim.

Delagarza also argues the prior violent acts evidence should have been excluded under Evidence Code section 352 as more prejudicial than probative. We disagree. As noted above, the evidence was probative. Moreover, the admission of the evidence was not unduly time-consuming or unfairly inflammatory. Accordingly, the court did not abuse its discretion in admitting the evidence. (*People v. Gutierrez* (2009)

10

45 Cal.4th 789, 808 ["We review a trial court's ruling under Evidence Code section 352 for abuse of discretion."].)

III. *Abstract of Judgment*

Finally, respondent notes that amended abstract of judgment in this case does not conform with the oral pronouncement of sentence. Specifically, the abstract of judgment omits the two additional five-year terms under Penal Code section 667, subdivision (a)(1). Respondent requests we order the abstract of judgment corrected. After reviewing the record, we agree the abstract of judgment does not reflect the oral pronouncement of judgment imposing the two five-year terms. We exercise our discretion to order the abstract of judgment corrected. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 187 ["Court of Appeal here could have corrected clerical errors in the abstract of judgment without a request from either party.]".)

**DISPOSITION**

The judgment is affirmed. The clerk of the court is directed to correct the abstract of judgment to reflect the two five-year enhancements under Penal Code section 667, subdivision (a)(1), and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

DELANEY, J.

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.

11